# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CAYUGA NATION,<br>256 Cayuga Street<br>Union Springs, New York 13160,<br><br>       *Plaintiff*,<br><br>   v.<br><br>THE UNITED STATES OF AMERICA,<br><br>U.S. DEPARTMENT OF JUSTICE,<br>U.S. Department of Justice<br>950 Pennsylvania Avenue, NW<br>Washington, DC 20530-0001<br><br>FEDERAL BUREAU OF<br>INVESTIGATION,<br>935 Pennsylvania Avenue NW,<br>Washington, DC 20535<br><br>WILLIAM P. BARR, in his official<br>capacity as ATTORNEY GENERAL,<br>950 Pennsylvania Avenue, NW<br>Washington, DC 20530-0001<br><br>CHRISTOPHER A. WRAY, in his<br>official capacity as DIRECTOR of the<br>FEDERAL BUREAU OF<br>INVESTIGATION<br>935 Pennsylvania Avenue NW,<br>Washington, DC 20535<br><br>       *Defendants*. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br><br>Civil Action No._____<br><br>COMPLAINT |

## INTRODUCTION

1.    The Cayuga Nation ("Nation"), a federally recognized Indian nation, brings this

action against the United States of America, the U.S. Department of Justice, the Federal Bureau of

Investigation ("FBI"), Attorney General William P. Barr, and FBI Director Christopher A. Wray

to redress the FBI's unlawful denial of the Nation's application to obtain an Originating Agency

Identifier ("ORI") for the Cayuga Nation's Police Force and to access the federal criminal databases maintained by the FBI.

2.     ORIs are critical to law enforcement agencies, including those of Indian nations. ORIs allow these law enforcement agencies to access the FBI's databases, to coordinate with other law enforcement agencies, to identify and locate suspect vehicles and individuals, and to reduce risk and improve public safety.  Because access to these databases is so important to Indian nations, Congress has mandated that the "Attorney General shall permit tribal and Bureau of Indian Affairs law enforcement agencies" to "access and enter information" from these databases and "to obtain information from the[se] databases."  28 U.S.C. § 534(d).  Congress has further mandated that tribal law enforcement officials "shall be considered to be an authorized law enforcement official for purposes of access to" these databases so long as (1) the person seeking access is a "tribal justice official serving an Indian tribe"; (2) the Indian nation has "Indian country"; and (3) the Indian nation has "criminal jurisdiction" over its Indian country.  34 U.S.C. § 41107(3).

3.     Here, the Bureau of Indian Affairs ("BIA") and the U.S. Department of the Interior—which Congress provided "shall … have the management of all Indian affairs and of all matters arising out of Indian relations," 25 U.S.C. § 2—have determined that the Cayuga Nation and its Police Force meets each of these three requirements.  Yet the FBI denied the Nation's application for an ORI, without so much as acknowledging how its conclusion departed from the determinations of the BIA and the Department of the Interior.  This denial violated a slew of federal statutes and was arbitrary and capricious under the Administrative Procedure Act ("APA").  To redress this unlawful denial, the Nation brings this suit.

**JURISDICTION AND VENUE**

4.     This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1331 (because the Nation's claims arise under federal law), and 28 U.S.C. § 1362 (because this case is

brought by an Indian nation and arises under federal law). The United States has waived its sovereign immunity for claims for non-monetary relief brought under the APA and 5 U.S.C. § 706(1) and (2). *See* 5 U.S.C. § 702.

5.    Venue is proper in this district both because the defendants reside in the district, and because a substantial part of the events and omissions giving rise to the claim occurred in this district. 28 U.S.C. § 1391(b), (e).

## PARTIES

6.    The Cayuga Nation is a federally recognized sovereign Indian nation. *See* Indian Entities Recognized and Eligible to Receive Services from the United States Bureau of Indian Affairs, 85 Fed. Reg. 5462, 5463 (Jan. 30, 2020).

7.    In the 1794 Treaty of Canandaigua, the United States recognized a federal reservation for the Nation comprising 64,015 acres—located within what today are Seneca and Cayuga Counties in upstate New York—and pledged that the "reservation[ ] shall remain theirs, until they choose to sell the same to the people of the United States, who have the right to purchase." Treaty of Canandaigua of 1794, art. II, 7 Stat. 44, 45.

8.    The Nation's reservation has continuously existed for over 200 years, up through today.

9.    The Nation is governed by the Cayuga Nation Council. The Nation's federal representative is Clint Halftown.

10.    The United States of America is a sovereign nation.

11.    The U.S. Department of Justice is part of the executive branch of the United States government and is responsible for the enforcement of the law and administration of justice in the United States.

12.     The FBI is part of the executive branch of the United States government and is within the U.S. Department of Justice.  The FBI serves as one of the intelligence and security services of the United States and as one of its principal federal law enforcement agencies.

13.     William P. Barr is the Attorney General of the United States and is sued in his official capacity.

14.     Christopher A. Wray is the Director of the FBI and is sued in his official capacity.

## FACTUAL ALLEGATIONS

**A. The Statutes Requiring The FBI To Grant Originating Agency Identifiers To The Police Forces Of Indian Nations.**

15.     An Originating Agency Identifier, or ORI, is a unique code that allows law enforcement agencies to access certain databases maintained by the FBI, including the National Crime Information Center ("NCIC") and other databases maintained by the FBI's Criminal Justice Information Services ("CJIS") Division.

16.     Under 28 U.S.C. § 534(d), the "Attorney General shall permit tribal and Bureau of Indian Affairs law enforcement agencies - (1) to access and enter information into Federal criminal information databases; and (2) to obtain information from [Federal criminal information] databases."

17.     Under 34 U.S.C. § 41107(3), "[e]ach tribal justice official serving an Indian tribe with criminal jurisdiction over Indian country shall be considered to be an authorized law enforcement official for purposes of access to the National Crime Information Center."

18.     Hence, as applied to Indian nations, the FBI is required to grant access to the NCIC provided that (1) the person seeking access is a "tribal justice official serving an Indian tribe"; (2) the Indian nation has "Indian country"; and (3) the Indian nation has "criminal jurisdiction" over its Indian country.

19.     The U.S. Criminal Justice Information System National Data Exchange Policy and Operating Manual underscores that "[f]ull system participants are federal, state, local, and *tribal* [criminal justice agencies] throughout the U.S., District of Columbia, and U.S. territories." FBI, Criminal Justice Information Services (CJIS) National Data Exchange (N-DEx) System: Policy and Operating Manual § 1.5 (May 1, 2020), https://www.fbi.gov/file-repository/policy-and-operating-manual.pdf (emphasis added).

**B. The Cayuga Nation And Its Qualifications For An Originating Agency Identifier.**

20.     The Cayuga Nation meets each of the three requirements that the statutes set forth.

*1. Indian Nation*.

21.     The Cayuga Nation is a federally recognized, sovereign Indian nation.  *Supra* ¶ 6.

22.     Moreover, the "tribal justice officials"—defined by statute to include any "tribal law enforcement officer" or "any … person responsible for investigating or prosecuting an alleged criminal offense in tribal court," 25 U.S.C. § 2801(10)—who are seeking an ORI and access to the federal criminal information databases serve the Cayuga Nation.  *Infra* ¶¶ 75-77.

*2. Indian Country.*

23.     The Cayuga Nation has "Indian country."

24.     Congress has defined "Indian country" to include "*all* land within the limits of *any* Indian reservation under the jurisdiction of the United States Government, notwithstanding the issuance of any patent."  18 U.S.C. § 1151(a) (emphasis added).

25.     The Cayuga Nation has a federal reservation recognized by the 1794 Treaty of Canandaigua.

26.     "[E]very federal court" to consider the question, as well as the New York Court of Appeals, agrees that the Nation's federal reservation continues to exist and has not been disestablished.  *Cayuga Indian Nation of N.Y. v. Gould*, 930 N.E.2d 233, 247 (N.Y. 2010); *see*

*Cayuga Indian Nation of N.Y. v. Seneca Cnty.*, 260 F. Supp. 3d 290, 307-15 (W.D.N.Y. 2017) (collecting cases).

27.     In a June 17, 2019 letter (attached as Ex. A), the Director of the BIA reaffirmed that the Cayuga Nation's reservation "has not been diminished or disestablished."

28.     Because the Nation has a federal reservation that has not been diminished or disestablished, the Nation has "Indian country."

### 3.  *Criminal Jurisdiction And The Nation's Police Force.*

29.     The Cayuga Nation also has criminal jurisdiction over its "Indian country," which the Nation has exercised by—among other things—creating a police force.

30.     The BIA's June 17, 2019 letter again expressly recognizes that "the Cayuga Indian Nation may enforce its own criminal laws against Indians within the boundaries of the Reservation."  Ex. A at 1.

31.     The BIA's June 17, 2019 letter is consistent with settled principles of Indian law recognizing the inherent authority of Indian nations to enact criminal laws, to apply those laws to members and other Indians, and to create police forces, court systems, and incarceration facilities to enforce those laws.

32.     The Supreme Court first acknowledged these principles almost 200 years ago in *Worcester v. Georgia*, 31 U.S. 515, 560-61 (1832).

33.     These principles recognize that, although the Nation and its reservation exist within the boundaries of the United States and New York State, the "sovereignty retained by tribes includes 'the power of regulating their internal and social relations.'"  *New Mexico v. Mescalero Apache Tribe*, 462 U.S. 324, 332 (1983) (quoting *United States v. Kagama*, 118 U.S. 375, 381-82 (1886)).

34.     A core part of Indian nations' retained sovereignty is the authority to enforce tribal law.  Thus, the Supreme Court has explained that Indian nations' "right of internal self-government includes the right to prescribe laws applicable to tribe members and to enforce those laws by criminal sanctions," and that "[i]t is undisputed that Indian tribes have power to enforce their criminal laws against tribe members."  *United States v. Wheeler*, 435 U.S. 313, 322 (1978); *see Ortiz-Barraza v. United States*, 512 F.2d 1176, 1179 (9th Cir. 1975).

35.     Courts have repeatedly and expressly recognized Indian nations' inherent authority and right to form police forces.  The Ninth Circuit, for example, has explained that "Indian tribal police forces have long been an integral part of … tribal criminal justice systems and have often performed their law enforcement duties to the limits of available jurisdiction," and that the "propriety of operation of tribal police forces has been recognized, presently and in the past, by the federal government."  *Ortiz-Barraza*, 512 F.2d at 1179.  So too, the Supreme Court has "not … question[ed] the authority of tribal police to patrol … within a reservation."  *Strate v. A-1 Contractors*, 520 U.S. 438, 456 n.11 (1997).

36.     Indian nations sometimes choose to avail themselves of federal funding to support their law enforcement functions under the Indian Self-Determination and Education Assistance Act of 1975, Pub. L. 93-638; *see* 25 U.S.C. § 5301 *et seq.*  Likewise, Indian nations sometimes choose to enter cross-deputization agreements with federal and/or state authorities under the Indian Law Enforcement Reform Act of 1990 and the Tribal Law and Order Act of 2010, or state law. *See* 25 U.S.C. § 2801 *et seq.*; 25 C.F.R. Part 12.

37.     Such arrangements, however, are not necessary for Indian nations to exercise their criminal jurisdiction or to create law enforcement agencies, which instead are powers inherent in Indian nations' retained sovereignty.

38.     Consistent with these principles, many of New York's Indian tribes maintain police forces, including the Oneida Indian Nation, the Seneca Nation of Indians, and the Saint Regis Mohawk Tribe.  Although the police force of the Saint Regis Mohawk is expressly authorized by New York statute and enforces New York state laws, *see* New York Indian Law § 114, the other nations did not—and did not need to—obtain any authorization to create a tribal police force to enforce tribal laws.

39.     The BIA's June 17, 2019 letter again recognizes as much: It explains that the "Department of the Interior … does not have any relationship with [the Cayuga Nation's] Law Enforcement Department," and that the Nation's "officers are not federally commissioned," but reiterates that "Federal funding or commissioning is not necessary for the Cayuga Indian Nation to exercise its inherent sovereign authority to enforce its own laws inside the Cayuga Indian Nation Reservation boundaries through a law enforcement program."  Ex. A at 1.

40.     In 2018, the Cayuga Nation exercised own inherent authority to create a police force and a criminal justice system.

41.     The Nation, by Ordinance No. CN-2018-1, established an office of the Commissioner of Public Safety.  This ordinance further granted the Commissioner of Public Safety the power to establish a police force, whose primary function is criminal detention, apprehension, and investigation of suspected violations of the Nation's criminal laws.

42.     The Nation appointed Arthur F. Pierce, a former Captain of the New York State Police, as its Public Safety Commissioner.

43.     On May 18, 2018, the Nation appointed Colonel Mark Lincoln as its first Superintendent of Police.

44.     On May 31, 2018, the Nation entered into an agreement with Cambria County, Pennsylvania to house persons in the custody of the Nation's Police Force.

45.     The Nation purchased and outfitted police vehicles, and supplied uniforms and badges for the Nation Police.

46.     The Nation's Police Force promulgated a Policy Manual that governs the conduct of its officers.

47.     The Nation has adopted and implemented the Cayuga Nation Rules of Criminal Procedure and the Cayuga Nation Penal Code.

48.     The Nation has established a court system with jurisdiction under Nation law over offenses defined in the Nation's Penal Code, including a trial court, appellate court, prosecutor, and public defender.

49.     The Nation's Police Force began operating on July 31, 2018, and has been operating continuously since that date.

50.     The Nation's Police Force now numbers 20 officers, all of whom are experienced law enforcement professionals and have been previously certified by the New York State Division of Criminal Justice Services.  The Nation's Police Force patrols the Nation's reservation daily and regularly confronts potential criminal suspects.

51.     In February 2020, Nation Police responded to a violent protest at a Nation property in Seneca Falls, New York and made multiple arrests for violations of Nation laws.

52.     The Nation continues to receive threats of violence directed at the Nation's leadership and businesses.

53.     The Nation's Police Force regularly coordinates with state, local, and federal law enforcement officers and works in harmony with these law enforcement agencies.

54.     Absent an ORI, however, the ability of the Nation's Police to coordinate with other law enforcement agencies is hampered.  An ORI is necessary for the Nation's Police Force to better coordinate with other law enforcement agencies, to identify and locate suspect vehicles and individuals, and generally to reduce risk and improve public safety.  An ORI, as explained above, would give the Nation's Police Force access to the NCIC and other databases maintained by the FBI's CJIS Division.

**C.  The Cayuga Nation's Applications For An Originating Agency Identifier.**

55.     The Nation initially submitted its request for an ORI on or about March 28, 2018. This submission was made to Thomas J. Cascone, Information Technology Specialist for the New York State Police, the designated recipient in New York State for all ORI requests.

56.     Mr. Cascone, in turn, transmitted the Nation's request to the FBI.

57.     The Nation received no written response from the FBI.

58.     As a result, the Nation contacted Mr. Cascone on or about April 23, 2020 to inform him that it intended to renew its request for an ORI.

59.     In response to the Nation's outreach, Mr. Cascone invited a renewed application from the Nation and requested the following information and documentation:

a.  Statutory authority creating the Nation's Police Force;

b.  Statutory authority authorizing the law enforcement powers, duties, and functions of the Nation's Police Force;

c.  Training certifications to document that the Nation's Police Force officers are trained and certified as law enforcement officers and have arrest powers;

d.  Budget information for the Nation's Police Force;

e.  Information concerning whether the Nation's Police Force has been performing any type of law enforcement function and documentation showing cases handled; and

f.  Statutory authority giving the Nation's Police Force "jurisdictional/territorial authority" and information concerning "what that jurisdiction/territory includes."

60.     The Nation promptly and fully complied with Mr. Cascone's request by providing each piece of information that he had asked for.  In particular, by letter dated June 3, 2020, the Nation, through its counsel, supplied the following information and documentation:

a.  A history of the Nation and its treaty relationship with the United States, as well as a map of its 64,015-acre reservation, which has continuously existed for over 200 years and exists to this day.

b.  A statement describing the lawful governing body of the Cayuga Nation, the Nation's Council, and its federal representative, Clint Halftown, as recognized by the United States Department of Interior, Acting Assistant Secretary-Indian Affairs in a letter dated July 14, 2017.

c.  A letter dated November 14, 2019 in which Tara Sweeney, Assistant Secretary – Indian Affairs, stated that the Nation's "Council is the Nation's government for all purposes." *See infra* ¶ 77 & Ex. C.

d.  A copy of Cayuga Nation Ordinance No. CN-2018-1, whereby the Nation established an office of the Commissioner of Public Safety, with the power to establish a Nation Police Force, whose primary function is criminal detention, apprehension, and criminal investigation of suspected violations of Nation criminal laws.

e.  A copy of a press release announcing the appointment of a Superintendent of Nation Police, Colonel Mark Lincoln, together with Colonel Lincoln's resume, training transcript, professional references, and noteworthy awards.

f.  A description of activities undertaken by the Nation's Police Force and an analysis of the calls for service handled by the Nation's Police Force.

g.  Contact information for the Nation Police Force and Colonel Lincoln.

h.  A statement setting forth the Nation's need for an ORI.

i.  A copy of the implementing budget for the Nation's Police Force.

j.  A copy of an agreement with Cambria County, Pennsylvania to house persons in the custody of the Nation's Police Department.

k.  A copy of the Table of Contents for the Nation Police Department Policy Manual.

l.  Resumes for all of the Nation's Police officers, all of whom are experienced law enforcement professionals and have been previously certified by the New York State Division of Criminal Justice Services.

m.  Photographs depicting the vehicles and uniforms utilized by the Nation's Police Force.

n. A copy of the oath taken by Police Force officers.

o. An exemplar of the badge used by Police Force officers.

p. Copies of the Nation's Rules of Criminal Procedure and the Nation's Penal Code.

q. A detailed legal analysis setting forth the Nation's inherent right to establish its own police department as a matter of federal law.

**D. The FBI's Repeated, Unlawful, And Arbitrary Denials Of The Nation's Application To Obtain An Originating Agency Identifier And To Access Federal Criminal Information Databases.**

61.    By email dated June 8, 2020, Thomas J. Cascone stated that the FBI had denied the Nation's renewed request for an ORI and for access to the FBI's federal criminal information databases.

62.    In his email, Mr. Cascone stated that the FBI had previously denied the Nation's original request (made on March 28, 2020) by determinations made on April 19 and July 17, 2018 that the Nation was not an authorized criminal justice agency.

63.    The Nation has no record of receiving any such determinations.

64.    In response to Mr. Cascone's email, the Nation contacted the FBI by email dated June 8, 2020 requesting a written explanation for the denial of its application.

65.    The FBI responded by reply email dated June 9, 2020, stating that an "official denial letter" was being drafted.

66.    The FBI provided its official denial letter via a July 2, 2020 letter (the "July 2 Decision," attached as Ex. B) from Trudy Lou Ford, Section Chief, Global Law Enforcement Support Section, Criminal Justice Information Services Division of the FBI, which reiterated that the FBI was denying the Nation's request for an ORI for its Police Force.

67.    The July 2 Decision began by acknowledging that tribal justice officials "qualify for access to NCIC" if they "exercise criminal jurisdiction over Indian country."  Ex. B at 1.

68.     As explained above, the Nation's Police Force *does* exercise criminal jurisdiction over Indian country, as the BIA's June 17, 2019 letter recognizes, Ex. A at 1.

69.     The July 2 Decision nonetheless gave four reasons for the FBI's denial, each of which is plainly wrong.

70.     First, the July 2 Decision observes that the Nation "does not have lands in trust." Ex. B at 1.  But neither 28 U.S.C. § 534(d), nor 34 U.S.C. § 41107, requires an Indian nation to have trust lands.  And while § 41107 *does* require that an Indian nation have "criminal jurisdiction" over its "Indian country," trust lands are not necessary to satisfy either requirement.  *Supra* ¶¶ 23-28.  As the BIA's June 17, 2019 letter explains, the Nation "may enforce its … criminal laws against Indians within [its] Reservation" *even though* the Nation "does not have lands in trust." Ex. A at 1; *accord McGirt v. Oklahoma*, ___ U.S. ___, 140 S. Ct. 2452, 2460 (2020) (on a reservation that has not been disestablished, "[r]esponsibility to try [criminal cases] … fall[s] … to the federal government and Tribe").

71.     Second, the July 2 Decision asserts that "the Department of Interior … does not have any relationship with the [Nation Police] and the [Nation] does not receive any funding from the Department for law enforcement purposes."  Ex. B at 2.  This, too, is irrelevant.  Again, 28 U.S.C. § 534(d) and 34 U.S.C. § 41107 impose specific requirements.  But nowhere does either section require that an Indian nation's tribal justice officials receive federal funds or otherwise have a relationship with the Department of the Interior.  Instead, Congress mandated that the FBI "shall permit tribal … law enforcement agencies" access to the federal criminal information databases, 28 U.S.C. § 534(d), and that "[*e*]*ach* tribal justice official serving an Indian tribe with criminal jurisdiction over Indian country *shall be* considered to be an authorized law enforcement

official for purposes of access to the National Crime Information Center," 34 U.S.C. § 41107(3) (emphasis added).

72.     Moreover, the U.S. Solicitor General recently reaffirmed to the Supreme Court that Indian nations cannot be required to enter cross-deputization agreements or other such arrangements as a condition of exercising their inherent sovereignty to carry out their criminal jurisdiction—because such arrangements often carry conditions "that tribes may view as an affront to their sovereignty."  Pet. for Writ of Certiorari at 28, *United States v. Cooley*, No. 19-1414 (S. Ct. June 19, 2020).  Hence, "[r]equiring tribes to give up even *more* of their limited sovereignty merely to preserve law and order within reservation boundaries is not an adequate solution."  *Id.*

73.     Third, the July 2 Decision implies that because the Nation does not have trust land or a sufficient relationship with federal law enforcement officials, the Nation's reservation is not a "reservation under the *jurisdiction of the United States Government*"—and thus not "Indian country" under 18 U.S.C. § 1151.  Ex. B at 2 (emphasis added).  But again, this argument is clearly wrong, as the Solicitor General again has recognized.  As the leading Indian law treatise explains, the phrase "under the jurisdiction of the United States Government" "exclude[s] from the scope of the statute Indian reservations governed by certain states and thus not under federal protection"; it does not require that the federal government take any particular actions, or hold land in trust, before the land will be a "reservation" and "Indian country" under § 1151.  *Felix S. Cohen's Handbook of Federal Indian Law* § 3.04(2)(c)(ii) at 191 (Nell Jessup Newton eds. 2012).

74.     The Solicitor General has endorsed this interpretation and explained that he was "unaware of circumstances in which an Indian reservation—set aside, maintained, and denominated as such for a federally recognized tribe—has not been recognized as Indian country under the statutory definition," on the theory that the land was not "under the jurisdiction of the

United States Government."  *See* Supp. Br. for the United States at 19, *Sharp v. Murphy*, No. 17-1107 (S. Ct. Dec. 28, 2018).

75.     Fourth, the July 2 Decision asserts that "there is a serious dispute about who represents the lawful government of the Cayuga Nation," citing a state-court decision in *Cayuga Nation v. Campbell*, 34 N.Y.3d 282 (2019).  Ex. B at 1-2.  This assertion, again, is clearly wrong.

76.     BIA and the Department of the Interior "recognized … the 'Cayuga Nation Council,' … as the governing body of the Cayuga Nation," and a federal court upheld that decision against challenge.  *Cayuga Nation v. Bernhardt*, 374 F. Supp. 3d 1, 4-5 (D.D.C. 2019).  While a New York appellate court declined to accord controlling weight to that determination for purposes of establishing jurisdiction over certain state-law property claims, the BIA and the Department of the Interior have "the management of all Indian affairs and of all matters arising out of Indian relations."  25 U.S.C. § 2.  The determinations of the BIA and the Department of the Interior, not a New York state court, are binding on the FBI.

77.     Indeed, after the New York state-court decision, the Department of the Interior reiterated that it had recognized the Cayuga Nation Council "as the Nation's governing body without qualification," "for all purposes," and not "limited in any way."  Nov. 14, 2019 Letter from Tara Sweeney, Assistant Secretary – Indian Affairs to David W. DeBruin at 1 (attached as Ex. C).  The FBI is not free to depart from the settled position of the officials that Congress charged with managing Indian affairs.

**E.  The Cayuga Nation's Subsequent Communications With The FBI.**

78.     The July 2 Decision left no doubt that it reflected the FBI's final position.  It recited that the FBI had reached its decision "[a]fter a comprehensive review of the applicable laws, regulations, and policies," and that based on that review, "the CJIS Division has determined the

[Cayuga Nation's Police Department] does not qualify for access to the CJIS Division's systems." Ex. B at 1.

79.     And while the July 2 Decision stated that the Nation could contact "Mr. Todd C. Commodore" if it had "any questions, or require[d] further information," it did not suggest that Mr. Commodore could do more than answer questions about the decision that the FBI had already settled upon.  *Id.* at 2.

80.     To the contrary, the July 2 Decision stated that "[s]hould circumstances change, we will be happy to review a new request at that time," *id.*—underscoring that, from the FBI's perspective, its decision was definitive unless and until circumstances changed.

81.     Nonetheless, on July 22, 2020 the Nation wrote a letter to Mr. Commodore identifying the many errors in the July 2 Decision.  July 22, 2020 Letter from David W. DeBruin to Todd C. Commodore (attached as Ex. D).

82.     On July 29, 2020, Betsy C. Taylor of the FBI's Office of General Counsel stated that the Office was "in receipt of your letter … and [would] provide a coordinated response."  Ms. Taylor, however, did not suggest that the FBI intended to reconsider its decision or do anything besides reiterating its previous position.  Nor did Ms. Taylor identify any timeline for providing a "coordinated response."

83.     On September 18, 2020—having received no response from FBI—the Nation sent a further letter to the FBI.  The letter reiterated the Nation's disagreement with the FBI's decision; noted that there was no "process for further review of the Bureau's decision" but nonetheless requested that the FBI meet with the Nation and reconsider its decision; and stated that the Nation intended to file suit unless the FBI responded by September 28, 2020.  *See* Sept. 18, 2020 Letter from David W. DeBruin to Jason A. Jones at 2-3 (attached as Ex. E).

84.     By email dated September 25, 2020, the FBI "request[ed] until October 31, 2020 to provide" any further "updates" that the FBI might choose to make.  *See* Sept. 25, 2020 email from Richard McNally to David W. DeBruin at 1 (attached as Ex. F).

85.     The Nation has received no further communications from the FBI on this issue.

86.     In particular, the FBI has not provided any further update or clarification of its July 2 Decision.

87.     Due to the FBI's denial of the Nation's application, the Nation has been harmed in that it lacks an ORI and access to the FBI's federal criminal information databases; is unable to fully coordinate with other law enforcement agencies; is unable to identify and locate suspect vehicles and individuals; and is unable to reduce risk to Nation citizens and promote public safety.

## CLAIM FOR RELIEF

### Count One: Unlawful Action And Arbitrary And Capricious Action In Violation Of 28 U.S.C. § 534(d), 34 U.S.C. § 41107(3), 25 U.S.C. § 2, And The Administrative Procedure Act, 5 U.S.C. § 706(1)-(2)

88.     Paragraphs 1 through 87 of this complaint are incorporated by reference as if fully set forth herein.

89.     Under 28 U.S.C. § 534(d), the "Attorney General shall permit tribal and Bureau of Indian Affairs law enforcement agencies - (1) to access and enter information into Federal criminal information databases; and (2) to obtain information from [Federal criminal information] databases."

90.     The FBI unlawfully denied the Cayuga Nation's "tribal … law enforcement agenc[y]"—namely, the Cayuga Nation Police Force—access to the FBI's Federal criminal information databases.

91.     Under 34 U.S.C. § 41107(3), "[e]ach tribal justice official serving an Indian tribe with criminal jurisdiction over Indian country shall be considered to be an authorized law enforcement official for purposes of access to the National Crime Information Center."

92.     The FBI unlawfully denied the Cayuga Nation's Police Force access to the National Crime Information Center even though the Nation's Police Force consists of "tribal justice official[s] serving an Indian tribe with criminal jurisdiction over Indian country."

93.     Moreover, the FBI's denial was arbitrary and capricious in that the July 2 Decision failed to "examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'"  *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962)).  The FBI "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Id.*

94.     In particular, and among other things, the July 2 Decision acknowledged that the Cayuga Nation's Police Force was entitled to access the National Crime Information Center if the Police Force "exercise[s] criminal jurisdiction over Indian country," Ex. B at 1, but ignored that the Police Force does exercise such jurisdiction; asserted that the Nation does not have lands in trust and that the Nation's Police Force does not have a relationship with the Department of the Interior, *id.* at 1-2, but ignored that these assertions are irrelevant under 28 U.S.C. § 534 and 34 U.S.C. § 41107(3); suggested that the Nation's reservation is not a "reservation under the jurisdiction of the United States Government," *id.* at 2, when all federal reservations, including the

Nation's, are "under the jurisdiction of the United States" (as the Solicitor General has reaffirmed); and claimed that there is a "serious dispute" over the Nation's leadership, *id.* at 1-2, when the BIA and the Department of the Interior have definitively recognized the governing body of the Cayuga Nation.

95.    The July 2 Decision violated 25 U.S.C § 2 by failing to adhere to the determination by the Department of the Interior that the Cayuga Nation has criminal jurisdiction over Indian country and that the leadership dispute within the Nation has been resolved, and the July 2 Decision was arbitrary and capricious in departing without explanation from the determinations of the Department of the Interior.  *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 514 (2009).

96.    The July 2 Decision was also arbitrary and capricious insofar as it relied on the view that the Nation was required to have cross-deputization agreements or otherwise have a relationship with the Department of the Interior when the Solicitor General has reaffirmed to the Supreme Court that such agreements or relationships are unnecessary for Indian nations to exercise their criminal jurisdiction and their inherent sovereignty.

97.    The July 2 Decision is a "final agency action" within the meaning of the APA, and the Nation has no other adequate remedy.

98.    The foregoing defects render the July 2 Decision arbitrary, capricious, an abuse of discretion, and contrary to law in violation of the APA.

99.    Accordingly, pursuant to 5 U.S.C. § 706(1) and (2), the Nation is entitled to an order and judgment vacating and setting aside the FBI's denial of the Nation's application to obtain an ORI and to access the FBI's federal criminal information databases.

## PRAYER FOR RELIEF

**WHEREFORE,** the Nation prays that the Court:

100.    Enter an order vacating the FBI's denial of the Nation's application to obtain an ORI and to access the federal criminal databases maintained by the FBI;

101.    Declare that the Cayuga Nation is entitled to an ORI and to access to the federal criminal databases maintained by the FBI under 28 U.S.C. § 534(d) and 34 U.S.C. § 41107(3);

102.    Enter an injunction requiring the FBI to grant the Nation's application to obtain an ORI and to access the federal criminal databases maintained by the FBI;

103.    Award the Nation reasonable costs and attorneys' fees; and

104.    Award such other relief, legal or equitable, as this Court may deem just and proper.

Dated:  November 3, 2020                              Respectfully submitted,


                                                     /s/ David W. DeBruin
Gabriel M. Nugent (D.C. Bar No. 1005924)             David W. DeBruin (D.C. Bar No. 337626)
BARCLAY DAMON LLP                                    Zachary C. Schauf (D.C. Bar No. 1021638)
125 East Jefferson Street                            JENNER & BLOCK LLP
Syracuse, New York 13202                             1099 New York Ave., N.W.
Tel.: (315) 425-2836                                 Washington, DC  20001
Fax: (315) 703-7361                                  Tel.: (202) 639-6000
Email: gnugent@barclaydamon.com                      Fax: (202) 639-6066
                                                     ddebruin@jenner.com
                                                     zschauf@jenner.com