UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **CAYUGA NATION**,<br><br>    *Plaintiff,*<br><br>v.<br><br>**UNITED STATES OF AMERICA**, *et al.*,<br><br>    *Defendants*. | Case No. 1:20-cv-3179-RCL |

## MEMORANDUM OPINION

Plaintiff Cayuga Nation ("the Nation") is an Indian nation located within a reservation in the State of New York. The Bureau of Indian Affairs has recognized the Halftown Council—a six-member Cayuga Nation Council led by Clint Halftown—as the Nation's lawful governing body, but an opposing Council in the Nation disputes this recognition. Admin. R. ("AR") 27, ECF No. 25. The Nation, under the Halftown Council's leadership, established the Cayuga Nation Police Department ("Nation PD"). *Id.* at 68. The Nation PD then applied to the Federal Bureau of Investigations ("FBI") for an Originating Agency Identification Number ("ORI"), which would allow the Nation PD to access FBI-administered criminal databases. *Id.* Under the Tribal Law and Order Act of 2010 ("TLOA"), the FBI must treat "tribal justice official[s] serving an Indian tribe with criminal jurisdiction over Indian country" as law enforcement officials and grant them access to federal criminal information databases. 34 U.S.C. § 41107(3); 28 U.S.C. § 534(d). But the FBI declined to grant the Nation PD an ORI, citing the potential leadership dispute in the Nation. AR 484, 963.

The Nation filed this action to challenge that decision under the Administrative Procedure Act ("APA"). It argued that the FBI's decision was both arbitrary and capricious and not in

1

accordance with law, and asked this Court to vacate the FBI's denial, "[d]eclare that Cayuga Nation is entitled to an ORI and to access to the federal criminal databases maintained by the FBI," and "enter an injunction [pursuant to 5 U.S.C. § 706(1)] requiring the FBI to grant the Nation's application." Am. Compl. ¶¶ 118–20, ECF No. 12. Now, both parties move for summary judgment. Defs.' Mot., ECF No. 16; Pl.'s Mot., ECF No. 19.[1] Upon consideration of the parties' filings, applicable law, and the record herein, the Court will **GRANT IN PART** and **DENY IN PART** the Nation's motion for summary judgment and **GRANT IN PART** and **DENY IN PART** the FBI's motion for summary judgment. For the reasons below, the Court finds that the FBI's decision was arbitrary and capricious and will **VACATE** the FBI's decision. But injunctive relief under § 706(1) is not warranted here at this time.

## I. BACKGROUND

### A. The Cayuga Nation And Its Leadership

The Cayuga Nation resides within what is now considered Cayuga and Seneca Counties, New York. Pl.'s Mot. 6. In 1794, the federal government recognized a 64,015-acre reservation for the Nation and promised it would remain the Nation's until a time when the Nation would "choose to sell [it] to the people of the United States." Treaty of Canandaigua of 1794, art. II, Nov. 11, 1794, 7 Stat. 44, 45. Despite this promise, the State of New York unlawfully purchased the reservation lands in the late eighteenth and early nineteenth centuries. *Cayuga Indian Nation of N.Y. v. Pataki*, 413 F.3d 266, 268 (2d Cir. 2005). Recently, the Nation has repurchased properties within the reservation and begun to re-establish its homeland. Pl.'s Mot. 6. All federal courts who have considered the question have concluded that the Nation's reservation still legally exists.

---

[1] Defendant replied the Nation's motion for summary judgment, Defs.' Reply, ECF No. 22, and the Nation replied to Defendant's motion for summary judgment, Pl.'s Reply, ECF No. 24.

*Cayuga Nation of N.Y. v. Seneca Cnty.*, 260 F. Supp. 3d 290, 307–315 (W.D.N.Y. 2017) (collecting cases).

All parties acknowledge the leadership dispute in the Nation that spans decades. Pl.'s Mot. 16; Defs.' Mot. 8. The Nation adheres to the Haudenosaunee Great Law of Peace, an "oral, unwritten law." Defs.' Mot. 8 (citing *Cayuga Nation v. Bernhardt*, 374 F. Supp. 3d 1, 5 (D.D.C. 2019)). The governing body of the Nation has historically been the six-member Cayuga Nation Council ("CNC"). *Id.* Clint Halftown has been a member of the CNC for decades. Pl.'s Mot. 16 (citing *Cayuga Nation*, 374 F. Supp. at 6). In 2004, the Nation's Clan Mothers attempted to remove Halftown, Tim Twoguns, and Gary Wheeler from the CNC. Defs.' Mot. 9. The Clan Mothers maintain that they have the authority to appoint and remove members of the CNC. *Id.* But even after the Clan Mothers' 2004 removal attempt, the BIA continued to recognize Halftown as both a legitimate member of the CNC and the federal representative of the Nation. Defs.' Mot. 9; Pl.'s Mot. 16.

In 2011, the Clan Mothers tried again to remove Halftown, Twoguns, and Wheeler from the CNC. Defs.' Mot. 9. While the BIA originally recognized the new CNC without Halftown (the "Jacobs Council") as the legitimate governing body of the Nation, the Interior Board of Indian Appeals ("IBIA") vacated the BIA's decision, declining to involve itself in the tribal leadership dispute unless necessary. *See Cayuga Nation v. E. Reg'l Dir., BIA*, 58 IBIA 171 (2014). During this period, the Jacobs Council took possession of the Nation's security offices and other property. Pls.' Mot. 16. Halftown, Twoguns, and Wheeler maintained that they were still part of the properly constituted CNC (the "Halftown Council") and that the Jacobs Council was not a legitimate governing body. *Id.*

3

After years of dispute between the two CNCs, in 2016, the Halftown Council sent the citizens of the Nation a document requesting a referendum on the proper CNC leadership. AR 18. The Halftown Council maintains that this "statement of support" process is contemplated under the Haudenosaunee Great Law of Peace, which provides that when an "especially important matter of great emergency" arises, the issue may be submitted to the people to make a decision. *Id.* at 19. The Jacobs Council disagreed, arguing that the statement of support process runs counter to the Nation's law. *Id.* at 20. Pursuant to the "statement of support" process, 237 of the 392 adult Cayuga Nation citizens identified on the Nation membership roll supported the Halftown Council. *Id.* at 18.

Eventually, the BIA could no longer abstain from the Nation's dispute. Both the Halftown Council and the Jacobs Council applied for various federal contracts, each representing themselves as the legitimate governing body for the Nation. *Id.* The BIA, facing these competing contract applications from the opposing Councils, concluded that the statement of support process was a valid exercise of Nation law. *Id.* The BIA reasoned that, as evidenced by the Haudenosaunee Great Law of Peace, governance within the Nation on its most basic level "derives from the consent of the governed." *Id.* at 19. Accordingly, the "statement of support" could not be denied without denying the Nation's citizens "their fundamental human right to have a say in their own government." *Id.* at 20. Based on this conclusion, the BIA recognized the Halftown Council as the governing body of the Nation. *Id*. at 27. Three years later, in 2019, Assistant Secretary for Indian Affairs Tara Sweeney issued a letter confirming this decision and stating that the "Halftown Council is the Nation's government for all purposes." *Id.* at 892.

After the statement of support and the BIA's decision, the Nation, led by the Halftown Council, established the Office of the Commissioner of Public Safety. AR 68. Arthur Pierce, a

4

former Captain of the New York State Police, was appointed as the first Public Safety Commissioner and Chief of Police. *Id.* Pierce then established the Nation PD as its police force. *Id.* Colonel Mark Lincoln, a former member of the New York State Police, was appointed the Superintendent of Police, and other members of the police force were hired—often former New York State Police officers. *Id.* at 98.

In February 2020, pursuant to a "warrant from the Nation's court," the Nation PD moved to reclaim possession of buildings that it alleged the Jacobs Council had seized in 2014. Pl.'s Mot. 19. In a middle-of-the-night raid, the Nation PD detained eight individuals at gunpoint, issued criminal trespass complaints, and ultimately used bulldozers to demolish the "seized" buildings. Pl.'s Mot. 21; Defs.' Mot. 11; AR 904. A few days later, tribal members planned protests at the site of the demolished buildings. Pl.'s Mot. 21; Defs.' Mot 12. A confrontation between the protesters and Nation PD officers present at the protest turned violent. Pl.'s Mot. 21; Defs.' Mot 12. One Nation PD officer was hospitalized and the scene required non-tribal state and local police departments to respond. Pl.'s Mot. 21–22; Defs.' Mot 12.

### B. The National Crime Information Center, Originating Agency Identifiers, And The Tribal Law And Order Act Of 2010

The FBI maintains the National Crime Information Center ("NCIC")—a database that allows local, state, tribal, federal, foreign, and international criminal justice agencies to access criminal justice records. 28 C.F.R. § 20.3(n). The NCIC database includes sub-databases or "files" like the Known or Suspected Terrorist file, the Wanted Person file, the National Sex Offender Registry, the Violent Person file, the Protection Order file, the Missing Person file, and files related to other specific groups or stolen property. *National Criminal Information Center*, Fed. Bureau of Investigation, *available at* https://www.fbi.gov/services/cjis/ncic. A law enforcement agency that wants to access the NCIC needs an ORI. AR 939. The ORI is a unique number signifying that an

agency met particular qualifying criteria. 28 C.F.R. § 25.2. To receive an ORI, a law enforcement agency must proffer evidence of its statutory authority, budget, documentation officially creating the agency, documentation of the duties and functions of the agency, and documentation confirming that the officers are state or federally trained and certified. AR 946.

The Tribal Law and Order Act of 2010 ("TLOA") provides tribes with, among other things, access to national criminal databases like the NCIC. Tribal Law and Order Act of 2010, Pub. L. No. 111-211, 12 Stat. 2279 (2010). Relevant to this case, the TLOA requires that:

> (1) The Attorney General *shall ensure* that tribal law enforcement officials that meet applicable Federal or State requirements be permitted access to national crime information databases.
>
> \*   \*   \*
>
> (3) Each tribal justice official serving an Indian tribe with criminal jurisdiction over Indian country *shall be considered* to be an authorized law enforcement official for purposes of access to the National Crime Information Center of the Federal Bureau of Investigation.

*Id.* § 233(b) (codified at 34 U.S.C. § 41107(1), (3)) (emphasis added). The TLOA also mandates that the "Attorney General shall permit tribal and [BIA] law enforcement agencies . . . (1) to access and enter information into Federal criminal information databases; and (2) to obtain information from the databases." *Id.* § 233(a) (codified at 28 U.S.C. 534(d)).

## C. The Nation's ORI Application And The FBI's Determination

On March 28, 2018, the Nation PD submitted its first ORI application to Thomas J. Cascone, who worked for the New York State Police (a Criminal Justice Information Services Division Systems agency).[2] AR 68–69. Cascone forwarded the application to the FBI, which

---

[2] Tribal law enforcement agencies submit ORI applications either through a state Criminal Justice Information Services Division System agency, like the New York State Police, or the United States Department of Justice Office of Tribal Justice Tribal Access Program. AR 939.

denied the request after determining that the Nation PD was not an authorized criminal justice agency as defined in 28 C.F.R. § 20. *Id.* at 65. Though the FBI twice informed Cascone of this decision, the Nation alleges that it never received those communications. *Id*. at 65, 82; Am. Compl. ¶ 66.

In April 2020, the Nation PD renewed its request for an ORI through Cascone. AR 484. Cascone again contacted the FBI, which agreed to accept the Nation PD's complete ORI application. *Id.* at 483. The Nation PD's newly submitted application on June 5, 2020, included, among other things, a map of the Nation's reservation, a letter detailing its authority to form a police force, a Nation PD policy manual, Nation PD officer resumes, the Nation's Rules of Criminal Procedure and Penal Code, the letter from Assistant Secretary Sweeney declaring Halftown Council the governing body of the Nation "for all purposes," and the Nation PD budget. AR 482.

Just five days later, the FBI denied the Nation PD's application and found it was "not an authorized criminal justice agency performing the administration of criminal justice." AR 487. After the Nation PD requested a formal denial, the FBI issued a two-page letter explaining its reasoning. *Id.* at 484, 882–83. In that denial letter, the FBI cited the fact that "the Tribe does not have lands in Trust"; the fact that the New York Court of Appeals recently identified a "serious dispute about who represents the lawful government" of the Nation; the fact that the Department of the Interior "does not have any relationship" with the Nation PD; and the fact that the BIA had not "commissioned" the Nation PD. *Id.* at 484.

The Nation PD moved for reconsideration. *Id.* at 885. It contested several of the FBI's contentions, noting that the lack of "lands in trust" or whether it had a relationship with the BIA was irrelevant to whether the Nation PD were tribal justice officials with criminal jurisdiction over

7

Indian country. *Id.* It also highlighted the 2019 letter from Assistant Secretary Sweeney and the BIA's determination that the Halftown Council was legitimate "for all purposes." *Id.*

For months, the FBI did not respond to the Nation PD's request for reconsideration. The Nation PD requested that the FBI provide a deadline for reconsideration, and the FBI indicated it would act by October 31, 2020. *Id.* at 933. When that date came and passed, the Nation filed this lawsuit on November 3, 2020. Compl., ECF No. 1.

Just before the FBI was required to answer to the Nation's complaint, the FBI provided the Nation PD with an "addendum" purporting to clarify its decision. AR 963. The FBI stuck by its initial decision to deny the Nation PD's request for an ORI. *Id.* In the addendum, the FBI emphasized the leadership dispute within the Nation and rejected the notion that the BIA's determination of the Halftown Council as the legitimate governing body bound the FBI. *Id.* at 966–967. The FBI reiterated that it could "not conclude that any leadership officials presently serve as 'tribal justice officials' representing the Nation because a leadership dispute still exists." *Id*. at 965.[3]

In its lawsuit, the Nation claims that the FBI's decision violates the APA because it is both "not in accordance with law" and arbitrary and capricious. Am. Compl. ¶ 108–09. The Nation argues that the Nation PD meets the requirements for an ORI and that the FBI unlawfully withheld its ORI based on irrelevant factors. *Id.* ¶ 106. The Nation seeks an order vacating the FBI's denial, a declaration that the Nation PD is entitled to an ORI and to access the FBI databases, and an injunction requiring the FBI to grant the Nation PD's application. *Id.* ¶ 118–20.

---

[3] The FBI also stated that "leadership for the purposes of executing law enforcement authority" remained unresolved, even if leadership for BIA purposes *was* resolved. AR 965. It reasoned that the CNPD does not have "criminal jurisdiction" over Indian country because the February 2020 violence raised "serious examples of federal and state jurisdictional problems." *Id*. at 968. The FBI also conceded that whether the CNPD was authorized or commissioned by the BIA and whether the Nation has land in trust do not affect the Nation's criminal jurisdiction or the legitimacy of a tribal police force. *Id.*

Now, the parties cross-move for summary judgment. *See* Pl.'s Mot.; Defs.' Mot. The FBI replied to the Nation's motion, Defs.' Reply, ECF No. 22, and the Nation replied to the FBI's motion, Pl.'s Reply, ECF No. 24. Both motions are ripe for review.

## II.     LEGAL STANDARDS

### A. Summary Judgment

When a court decides motions for summary judgment in a suit "seeking review of an agency's actions, the standard under Fed. R. Civ. P. 56(a) does not apply." *Beyond Nuclear v. Dep't of Energy*, 233 F. Supp. 3d 40, 47 (D.D.C. 2017). Instead, the court must decide as a matter of law "whether the agency action is supported by the administrative record and otherwise consistent with the APA standard of review." *Coe v. McHugh*, 968 F. Supp. 2d 237, 240 (D.D.C. 2013). In these types of APA cases, summary judgment is favored. *Zemeka v. Holder*, 963 F. Supp. 2d 22, 24 (D.D.C. 2013).

### B. The Administrative Procedure Act

The APA "sets forth the procedures by which federal agencies are accountable to the public and their actions subject to review by the courts" and requires a reviewing court to set aside agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Dep't of Homeland Sec. v. Regents of the Univ. of California*, 140 S. Ct. 1891, 1905 (2020) (quoting 5 U.S.C. § 706). The APA ensures that agencies engage in "reasoned decisionmaking" and that their decisions evince "a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). "Where the agency has failed to provide a reasoned explanation, or where the record belies the agency's conclusion, [the court] must undo its action." *AT&T Co. v. FCC*, 974 F.2d 1351, 1354 (D.C. Cir. 1992).

Courts are empowered to set aside agency action that is arbitrary and capricious. 5 U.S.C. § 706(2). This "narrow standard of review" asks courts to "assess only whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Cigar Ass'n of Am. v. United States Food & Drug Admin.*, 5 F.4th 68, 74 (D.C. Cir. 2021). In general, an agency decision will be considered arbitrary and capricious if:

> the agency has [1] relied on factors which Congress has not intended it to consider, [2] entirely failed to consider an important aspect of the problem, [3] offered an explanation for its decision that runs counter to the evidence before the agency, or [4] is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*State Farm*, 463 U.S. at 43. Simply put, "the agency must explain why it decided to act as it did," *Butte Cnty. v. Hogen*, 613 F.3d 190, 194 (D.C. Cir. 2010), and the reason for the agency's decision must be "both rational and consistent with the authority delegated to it by Congress," *Xcel Energy Servs. Inc. v. FERC*, 815 F.3d 947, 952 (D.C. Cir. 2016).

The APA also authorizes courts to "compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1). Standing opposite to a court's authority to set aside an agency action, § 706(1) provides relief for an agency's failure to act. *Ctr. for Biological Diversity v. Zinke*, 260 F. Supp. 3d 11, 19 (D.D.C. 2017). "[A] claim under § 706(1) can proceed only where a plaintiff asserts that an agency failed to take a *discrete* agency action that it is *required to take*." *Norton v. S. Utah Wilderness Alliance* (*SUWA*), 542 U.S. 55, 65 (2004) (emphasis in original). Section 706(1) empowers a court to compel an agency to perform only "ministerial or non-discretionary act[s]." *Id*. at 64 (quotation omitted).

### III.   DISCUSSION

At issue here is the FBI's determination that the Nation PD failed to prove (1) that it was a tribal justice agency serving an Indian tribe and (2) that it held criminal jurisdiction over tribal

land. The FBI argues that denying the Nation PD's application was a "rational exercise of the FBI's discretion." Defs.' Mot. 16. The Nation first argues that because the FBI violated a mandatory duty, the Nation is entitled to an injunction under § 706(1). Pl.'s Mot. 24. On this argument, the Court disagrees. The FBI did not fail to perform a ministerial duty that requires no exercise of judgment, so the Court cannot grant an injunction under § 706(1). In the alternate, the Nation argues that the FBI's decision was not in accordance with law and arbitrary and capricious, and asks the Court to set it aside pursuant to § 706(2). *Id.* at 35. The Court agrees that the FBI's decision was arbitrary and capricious because it relied on a "slew of considerations" that are irrelevant under the TLOA. *Id.* at 35.

    **A. The FBI Could Use Its Judgment To Determine Whether The Nation PD Met The Three TLOA Criteria And Injunctive Relief Is Unwarranted Here**

    The Nation first argues that the FBI violated a mandatory duty by unlawfully withholding the ORI and seeks (1) a declaration that the Nation PD is entitled to an ORI and (2) an injunction requiring the FBI to grant the Nation PD access to the NCIC. *Id.* ¶¶ 108, 117, 119–20. The APA empowers a court to "compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1). But a court can grant an injunction under § 706(1) only if an agency failed to perform a required "ministerial or nondiscretionary" duty—a "discrete agency action that it is required to take." *SUWA*, 542 U.S. at 63. The action must be one "about which an official had no discretion whatever." *In re Long-Distance Tel. Serv. Fed. Excise Tax Refund Litig.*, 751 F.3d 629, 634 (D.C. Cir. 2014) (quoting *SUWA*, 542 U.S. at 63). Here, the Nation has not satisfied § 706(1)'s "exacting requirements." *Id.*

    Despite the FBI's references to its "discretion in controlling access to highly confidential and sensitive information," Defs.' Mot. 14, all parties agree that three requirements trigger the

11

FBI's duty to grant access to the NCIC. Defs.' Mot. 4; Pl.'s Mot. 26.[4] To gain access, (1) the entity must be a "tribal justice official serving an Indian tribe," (2) the Indian nation must have "Indian country", and (3) the Indian nation needs "criminal jurisdiction" over its Indian country. 34 U.S.C. § 41107(3). If these three criteria are met, the FBI "shall" provide access to the NCIC and lacks discretion to deny access based on other concerns. 34 U.S.C. § 41107(1), (3); *see Kingdomware Techs., Inc. v. United States*, 579 U.S. 162, 171 (2016) ("Congress' use of the word 'shall' demonstrates that [the statute] mandates [the action]."). The question is what discretion, if any, Congress gave the FBI in determining whether these three requirements are met.

The Nation argues that the FBI has no discretion when making its ORI determination and the required action—granting the ORI—is purely ministerial. Pl.'s Mot 26. But the Nation is short of support for its argument that the FBI has "no discretion whatsoever" to determine whether the TLOA's three requirements are met. *In re Long-Distance Tel. Serv. Fed. Excise Tax Refund Litig.*, 751 F.3d at 634. What's more, the FBI's duty here differs from the purely ministerial, non-discretionary acts that the Supreme Court has recognized in the past. *See, e.g.*, *United States ex rel. Dunlap v. Black*, 128 U.S. 40, 46 (1888). The Supreme Court has emphasized that a purely ministerial, non-discretionary act is one which requires no "exercise of judgment or discretion." *Id.* But in performing its duty, the FBI must judge, for example, whether an entity is a "tribal justice official *serving* an Indian tribe." 34 U.S.C. § 41107(3) (emphasis added).

In determining that the FBI's action at issue here is not a ministerial or non-discretionary act that would allow this Court to grant relief under § 706(1), it is helpful to consider what the FBI did *not* do. The FBI did not determine that the Nation PD met the three TLOA requirements, then

---

[4] Because the TLOA implicates multiple agencies' responsibilities, the FBI is not entitled to any deference under *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984). *See Martin v. Occupational Safety & Health Review Comm'n*, 499 U.S. 144, 149 (1991).

12

refuse to grant its ORI application anyway—that would amount to unlawful withholding of a non-discretionary act. The FBI did not refuse to consider the ORI application at all. Instead, the FBI determined that the three requirements triggering a mandatory duty were not met—so it did not perform that duty. While the FBI exceeded the bounds set by Congress in making that determination, as discussed below, the Court will not go so far as to say that the FBI has *no* judgment or discretion in determining whether the three TLOA criteria are met. Accordingly, this Court cannot grant the Nation relief under § 706(1).

### B. The FBI's Determination Was Arbitrary and Capricious

The Nation also challenges the FBI's determination under § 706(2) and argues that it was both not in accordance with law and arbitrary and capricious. Pl.'s Mot. 35. When reviewing agency action under the arbitrary and capricious standard, a court's review is narrow—it must not substitute its own judgment for that of the agency by second-guessing determinations or by finding an appropriate basis for an agency decision that the agency did not provide. *State Farm*, 463 U.S. at 42–43. A court merely looks for a rational decision that is consistent with Congress's delegation of authority. *Xcel Energy Servs.*, 815 F.3d at 952. Of particular relevance here, an agency decision is inconsistent with Congress's delegation of authority—and thus arbitrary and capricious—when "the agency has relied on factors which Congress has not intended it to consider." *State Farm*, 463 U.S. at 43. Here, the FBI's determination relies heavily on factors that Congress did not intend it consider. Even if those considerations could influence whether the Nation PD met the TLOA's three criteria, the FBI fails to rationally connect its reasoning to the statutory criteria. Because the FBI went far afield from the strict instructions of Congress, its decision was arbitrary and capricious.

13

Congress instructed the FBI to evaluate three factors: (1) whether the Nation PD were tribal justice officials; (2) whether the Nation PD served an Indian tribe; and (3) whether the Nation had criminal jurisdiction over its Indian country. *See* 34 U.S.C. § 41107(3). Instead, over the course of two letters, the FBI explained that it considered:

- the fact that the Nation "has no federal trust lands under the jurisdiction of the United States," AR 921, despite recognizing that the "BIA states that the Cayuga Nation reservation still exists even though there are no federal trust lands," *id.*, and that a lack of trust lands does not affect whether the Nation has criminal jurisdiction, *id.* at 950;

- the fact that the "BIA provides no funding to the Nation PD," has "no relationship with the Nation PD," and has "not commissioned the Nation PD with federal law enforcement authority," *id.* at 921;

- the fact that the Nation PD does not "represent[] the interests of Cayuga Nation, *as a whole*," *id.* at 945 (emphasis added);

- the Nation PD's "unwillingness . . . to use restraint," *id.* at 950;

- the fact that the BIA exercised its discretion to deny a request by the Nation to move 114 acres of land into trust, *id.*;

- concerns of "serious . . . federal and state jurisdictional problems and conflicts of land use which impacted public safety and undermined the hope that such conflicts as may arise with local or State government in the future could be successfully managed," *id.* at 950;

- the possibility of inflaming "tension between the Nation and its neighbors," *id.*;

- the concern "that the Nation's unilateral demolition of property, detention of Tribe members, and subsequent violence were serious matters that weakened the trust that the Nation's government can operate at this time in a harmonious nature with the other governments and law enforcement officers that share the same geography," *id.*;

- "general poor relations and lack of intergovernmental agreements between the Nation and its neighbors," *id.*;

14

- worries regarding "the civil rights of Individual Tribe members and the absence of Tribal laws protecting its members from arbitrary exercise of government authority, [and] the apparent unwillingness [of the Nation PD] to use restraint," which the BIA recognized in a (discretionary) land-in-trust determination, *id.*; and

- the February 2020 Nation PD actions, which the FBI characterized as "violen[t]" and raised concerns about whether the leadership officials serve as "tribal justice officials," *id.* at 947.[5]

AR 920–21; 945–51. Relying on these factors, the FBI denied the Nation PD's application.

Congress gave the FBI strict instructions, clear criteria, and a duty. Instead of following those instructions, the FBI made its determination based on the surfeit of extraneous factors above. Congress did not mandate that the FBI shall grant an ORI only to a tribal law enforcement agency that operates harmoniously with other governments in the area. It did not instruct the FBI to grant an ORI only to tribes that have FBI-approved "Tribal laws protecting its members." AR 950. It did not grant the FBI the authority to deny a tribal law enforcement agency's application based on an "unwillingness" to use restraint. *Id.* Still, the FBI denied the application based on the above-mentioned factors—factors manifestly different from the narrow criteria Congress provided.

The FBI argues that the Nation can point to no limits on what "Congress permitted the FBI to consider in making the determination of whether the CNPD officers are 'tribal justice official[s] serving an Indian tribe with criminal jurisdiction over Indian country.'" Defs.' Reply 23 (quoting 34 U.S.C. § 41107(3)). While that may be true, at its broadest Congress mandated the FBI evaluate only the considerations relevant to whether the three TLOA criteria are met. In other words, if the

---

[5] The Nation argues that the FBI's February 2021 addendum is a "post-hoc rationalization" not properly before the Court. Pl.'s Mot. 35–36. The FBI vehemently denies this, arguing that the Nation specifically requested a reconsideration from the FBI and that the February 2021 addendum only elaborates on reasons included in the original denial. Defs.' Reply 25–26. Because the Court finds that the FBI's determination was arbitrary and capricious even with the February 2021 addendum, the Court need not reach whether the February 2021 addendum is an improper post-hoc rationalization. But the Court will note that both the July 2020 decision and the February 2021 addendum identify that there are disputes about the legitimate governing body of the Nation—that reasoning does not appear for the first time in the February 2021 addendum. AR 882–83, 949.

FBI could be able to consider whether there are "Tribal laws protecting its members" from overreach, it could only do so to the extent that that consideration helped determine whether one of the three statutory criteria are met. But the FBI was instead considering these factors "in determining whether that agency *should* have access to highly sensitive criminal databases." Defs.' Reply 22 (emphasis added). That consideration is beyond Congress's mandate.

Even if the factors cited above were somehow appropriately considered, the FBI's decision letters failed to rationally explain how these factors relate to the three TLOA requirements. This Court cannot "supply a reasoned basis for the [FBI's] action that the [FBI] itself has not given." *State Farm*, 463 U.S. at 43. While the FBI does not need to provide a perfectly clear decision to survive arbitrary and capricious review, it does need to provide a discernable path. *Id.* Here, the FBI did not even attempt to link factors like "poor relations" with governmental neighbors or the unwillingness of the Nation PD to use restraint to its analysis of whether the Nation PD was composed of "tribal justice officials serving an Indian tribe with jurisdiction over Indian country." 34 U.S.C. § 41107(3). Absent a discernable roadmap, this Court has no choice but to find that the FBI considered factors Congress did not intend it to consider.

In short, whether the FBI considered extraneous factors Congress did not intend it to consider or whether the FBI failed to connect its considerations to the three TLOA criteria in any "reasonably . . . discern[able]" way, *State Farm*, 463 U.S. at 43, the FBI's determination was arbitrary and capricious. This Court will set aside the FBI's determination as required by statute. 5 U.S.C. § 706(2). In so deciding, the Court will not reach the issue of whether the FBI is bound by the BIA's determination regarding Halftown Council's legitimacy. Additionally, because this Court finds the FBI's decision arbitrary and capricious, the Court will not address whether the FBI's decision was not in accordance with law.

## IV.    CONCLUSION

Based on the foregoing, the Court will **GRANT IN PART** and **DENY IN PART** the Nation's motion for summary judgment and **GRANT IN PART** and **DENY IN PART** the FBI's motion for summary judgment by separate order. "If the record before the agency does not support the agency action . . . the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation." *Florida Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985). Accordingly, the Court will **VACATE** and **SET ASIDE** the FBI's denial of the ORI application as arbitrary and capricious, and **REMAND** to the FBI for additional explanation and investigation consistent with this opinion.

Date: 3/29/22

Royce C. Lamberth
United States District Judge